In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-05-330 CV


____________________



JAMES G. GORDON and LISA K. GORDON, Appellants



V.



GEORGE DAVID GORDON, JR., Appellee






On Appeal from the 9th District Court


Montgomery County, Texas


Trial Cause No. 03-01-00006-CV






MEMORANDUM OPINION


 Plaintiffs, James G. Gordon ("Greg") and his wife, Lisa, (hereafter referred to as
"plaintiffs" or "appellants") appeal a take nothing judgment rendered against them following
a bench trial. (1) We affirm in part, reverse in part, and remand for a new trial.

 Plaintiffs initially sued Greg's brother, George David Gordon, Jr. ("David"), David
Covey, and SGD Holdings, Ltd. ("SGD"). The record indicates that just prior to
commencement of trial; SGD filed bankruptcy proceedings in the State of Delaware. SGD's
bankruptcy resulted in an automatic stay which abated any further proceedings against it. See
In re Sw. Bell Tel. Co., 35 S.W.3d 602, 604 (Tex. 2000). (2) A mid-trial agreement between the
parties also resulted in plaintiffs nonsuiting defendant David Covey. Therefore, the
remaining defendant, in whose favor judgment was ultimately rendered, was David Gordon. 
 The appellate record is quite extensive, with the reporter's record numbering thirty-two volumes, much of which consists of voluminous exhibits that were admitted en masse. 
This case was tried to the judge in a relatively rapid manner, with the vast majority of
hundreds of exhibits and deposition transcripts being pre-admitted and admitted by
agreement without specific review of them during direct or cross-examination of the several
witnesses. Plaintiffs proceeded to trial on multiple causes of action and theories of liability. 
Closing arguments were allowed in written form and consisted of more than one hundred
pages, with multiple references to documentary evidence. While the trial court filed findings
of fact and conclusions of law, the findings of fact number only twelve and are broad
evidentiary statements that do not correspond to the ultimate and controlling issues of each
cause of action pled. See generally Tex. R. Civ. P. 296; Limbaugh v. Limbaugh, 71 S.W.3d
1, 6 (Tex. App.--Waco 2002, no pet.). There are only four conclusions of law, none of which 
coordinates with the various causes of action tried to the court. As a complete reporter's
record appears in the appellate record, the findings of fact are not conclusive on this court
and are reviewed for legal and factual sufficiency of the evidence. See City of Beaumont v.
Spivey, 1 S.W.3d 385, 392 (Tex. App.--Beaumont 1999, pet. denied); Stephenson v. Perlitz,
537 S.W.2d 287, 289 (Tex. Civ. App.--Beaumont 1976, writ ref'd n.r.e.). We have carefully
examined the entire record in light of the individual elements of the causes of action asserted
by plaintiffs in twenty-one issues raised on appeal.

FACTS


 Greg Gordon and David Gordon are brothers. David is an attorney who specializes
in the area of corporate law ("mergers and acquisitions"), tax law, and securities, which also
includes having represented clients before the Securities and Exchange Commission. Prior
to events that spawned the instant litigation, plaintiffs had been, from 1994 to 1999, the
owners and operators of a retail jewelry business, Con-Tex Silver Imports, Inc. ("Con-Tex"),
located in Conroe, Texas. Either in December of 1998, or March or April of 1999, David
initiated conversations with Greg and Lisa regarding a plan to convert Con-Tex into a
publicly-traded corporation. Plaintiffs eventually agreed to allow David to take their
business public after being assured they could maintain control of the newly formed
corporation, as they had built Con-Tex up to a value estimated at more than one million
dollars. The agreement, as structured by David, provided for plaintiffs to transfer complete
ownership of Con-Tex to a publicly-traded "shell" (3) corporation, in exchange for 75 million
shares in the new corporation. This would result in plaintiffs becoming "super majority"
shareholders in the new corporation and allow them to sell a sufficient number of shares to
recover their investment while maintaining their majority shareholder position. Greg testified
that David instructed Lisa and Greg to continue doing what they had been doing, selling
jewelry. Through a series of transactions in 1999, Con-Tex was merged into a publicly-traded corporation. 

 Prior to this time, David had ongoing dealings with various individuals and corporate
entities with whom he was engaged in multiple mergers and acquisitions, "trading or selling
shells," that included but was not limited to Universal Funding, Inc. and International
Internet. International Internet was a public corporation in which David was a shareholder
and acted as its legal counsel. David testified that International Internet wanted to spin-off
one of its privately held corporate entities, Goldonline.com ("Goldonline"), into a publicly
traded company but that the principals reportedly did not want to run the operations of the
company. David testified that he suggested that his brother, Greg, operate the company. (4) 
David had incorporated Goldonline in February 1999, its only asset was a rudimentary
website that International Internet had previously purchased. International Internet found a
"shell" corporation, Transun International Airways, Inc. ("Transun"), that had public trading
rights. David represented Universal Funding in the purchase of the majority of stock in
Transun and held shares in his name as trustee. International Internet spun-off Goldonline
into Transun in the first week of June 1999. Then, on or about June 10, 1999, the reverse
acquisition occurred between Transun and Con-Tex. On that same day, Transun changed its
name to Goldonline International, Inc. Goldonline International, Inc. subsequently changed
its name to SGD Holdings, Ltd. on January 24, 2001. 

 David testified that approximately fifty percent of his legal business in and around
1999 consisted of mergers and acquisitions. David had various individuals either employed
by him or officing with him, involved in the preparation of documentation necessary for
"trading or selling shells," including the purchase and sale of stock and other corporate
transactions and governmental filings associated with the merger, acquisition and operations
of various corporate entities, as well as issuing press releases. These persons were also
utilized in the business plan to take Con-Tex public, namely: Susan Willis, David's
paralegal; Jesse Clayton, a nonlawyer that utilized David's law office space and who
reportedly provided contract labor for David including drafting documentation for David and
his clients for these "shell deals," as well as someone who was often named as an officer and
director of the shell corporations; (5) and, Jim Ross, an accountant employed by David, who
prepared governmental filings for the SEC and the IRS. David admitted he reviewed the
work of these nonlawyers who worked in his law office.

 The legal documentation drafted by David and the nonlawyers under his supervision
regarding the formation, operation, and merger of the various corporate entities involved in
this matter, including the purchase and sale of stock associated with this shell deal, is replete
with errors. The initial stock purchase agreement that was to initiate the business plan to take
Con-Tex public was flawed in several ways. It incorrectly recited that Greg Gordon was the
sole shareholder of Con-Tex, it incorrectly recited the number of shares of Con-Tex owned
by Greg, it provided that Greg would receive only five hundred shares of Transun instead of
75 million shares in exchange for his interest in Con-Tex, and it refers to numerous attached
exhibits, none of which are actually attached. David later claimed that the written stock
purchase agreement document was so flawed it did not even reflect the actual agreement with
Greg. Instead, David claimed they operated under an oral agreement. According to David,
Susan Willis drafted the Certificate of Amendment of Certificate of Incorporation of
Goldonline that allegedly evidenced and authorized the controversial one for six reverse split
in the stock of the corporation. The certificate of amendment failed to mention Goldonline
in the body of the resolution but instead, named two other unrelated corporate names. David
insisted that Jesse Clayton was solely responsible for drafting many, if not all, of the
transactional documents in the early stages of the Con-Tex and Transun merger, including
but not limited to the mistake-ridden Stock Purchase Agreement. (6) During the initial phases
of the "shell deal" involving Con-Tex, Jesse Clayton suffered a debilitating stroke which
rendered him unable to continue to work. Clayton's untimely illness, combined with an
August 1999 telephone call from the FBI to David regarding a SEC investigation into the 
"shell" corporation, Transun, appears to have disrupted the timing of events and issuance of
documentation with regard to this particular "shell deal" and eventually led both to the filing
for bankruptcy protection by the originating corporate entities and to the filing of this lawsuit. 
 The record indicates that following the merger of Con-Tex into the newly formed
publicly-traded corporation in 1999, Greg was issued and became entitled to 75 million
shares of SGD stock. Because of Greg's status as an insider, his stock certificates were
issued with a restrictive legend, prohibiting their unrestricted transfer. (7) Upon the anniversary
date of the closing of the sale of Con-Tex, Greg and Lisa communicated their desire to David
to begin selling the maximum number of shares of stock allowed by law. The unrefuted
evidence shows that despite the expiration of the holding period provided by SEC regulations
and Greg's and Lisa's growing frustration, David continued to advise Greg and Lisa that they
were legally prohibited from selling or otherwise trading any of their shares of stock. In
2002, when Greg refused to sign the annual audit letter and the annual "10-K" report to the
SEC, a majority of the Board of Directors removed him as president of SGD. Greg and Lisa
were both subsequently terminated from their employment with Con-Tex. Greg and Lisa
were never allowed or otherwise able to sell any shares of SGD stock before the company
filed bankruptcy. Greg and Lisa filed the instant action on January 2, 2003.

CLAIMS AND ISSUES


 Greg's and Lisa's causes of action include breach of fiduciary duty, breach of
confidential relationship, common law fraud, constructive fraud and fraudulent concealment,
negligent misrepresentation, negligence and gross negligence, statutory fraud, fraudulent
conversion, conspiracy, violation of the Texas Securities Act, securities fraud under the
Texas Business and Commerce Code, and a request for declaratory judgment and specific
performance. (8) The trial court issued separate findings of fact and conclusions of law. 
Plaintiffs raise nineteen issues for review complaining of the propriety of certain findings of
fact or conclusions of law, one issue complaining of the trial court's failure to grant a new
trial in light of newly discovered evidence, and one issue complaining of the trial court's
refusal to admit an item of evidence. For convenience, we will group some of the appellate
issues together for discussion. We will also address the appellate issues in no particular
order. We begin with several anomalous issues. 

 Issue six complains of the trial court's failure to grant appellants a new trial. 
Appellants moved for a new trial based upon newly discovered evidence, which the trial
court denied. A party seeking a new trial on the ground of newly discovered evidence must
satisfy the trial court that: (1) the evidence has come to his knowledge since the trial; (2) it
was not owing to the want of due diligence that the evidence did not come to his attention
sooner; (3) the evidence is not cumulative; and (4) the evidence is so material that it would
probably produce a different result if a new trial were granted. Jackson v. Van Winkle, 660
S.W.2d 807, 809 (Tex. 1983); Johnson v. Legacy Bank of Texas, 167 S.W.3d 643, 645-46
(Tex. App.--Dallas 2005, no pet.). "Whether to grant a motion for new trial is within the
sound discretion of the trial court and, absent abuse of such discretion, the trial court's
decision will not be disturbed on appeal." Johnson, 167 S.W.3d at 646.

 The alleged newly discovered evidence consists of a letter dated August 3, 2004,
written by David to his mother, Darla Gordon. Greg contends the letter contains an
"admission" by David: "that Greg Gordon could rely on [David's] advice, because [David]
was Greg's brother and because he was SGD's counsel." The letter was written six months
before the trial commenced. More importantly, the letter is written in the form of a reply to
a prior letter from David's mother and appears to attempt to respond to certain words,
phrases, or sentences taken out of context from prior conversations between David and his
mother. David's letter consists of almost five pages of single-spaced text. The one small
portion to which Greg directs our attention does not clearly indicate David was admitting to
having been personal counsel for Greg and Lisa, or that David was indicating that any advice
he had provided to Greg was solely in David's capacity as Greg's brother or Greg's personal
attorney. Taken in its entirety, David's letter is highly self-serving. Having considered all
of the evidence elicited at the trial, as well as Darla's testimony at the motion for new trial
hearing, the trial court may have concluded that David's letter was not material and that
nothing it contained would probably lead to a different result upon retrial. See Jackson, 660
S.W.2d at 809. From the record presented, we cannot say the trial court abused its discretion
in denying Greg's new trial motion. Issue six is overruled. 

 In issue one, appellants complain that an oral statement of the judge made on the
record during the trial is in direct contradiction to separate findings of fact issued by the trial
court, specifically Finding of Fact Number Eight. During the trial of the case, the judge
made the following colloquy on the record:

 [David] was legal counsel for [plaintiffs] up until the point in time that
he accomplished exactly what he said, which was to get the company to go
public. [David] became General Counsel then for the corporation. His
representation to [plaintiffs] ended that moment, because he became a
shareholder, he became a director, and then the duties and the obligations and
the fiduciary relationship altered.


In Finding of Fact Number Eight, the trial court stated, in part, that "Plaintiff's [sic] failed
to prove that defendant G. David Gordon, Jr. acted as Plaintiffs' personal attorney rather than
counsel for the various corporations that Plaintiff's [sic] was [sic] a share holder, officer and
director." Generally, "[o]ral statements by the judge on the record will not be accepted as
findings of fact." In re E.A.S., 123 S.W.3d 565, 569 (Tex. App.--El Paso 2003, pet. denied);
Tate v. Tate, 55 S.W.3d 1, 7 n.4 (Tex. App.--El Paso 2000, no pet.). Appellants make no
complaint to this court on appeal that the trial court's statements in any way misled them or
otherwise caused them to withhold an offer of other evidence of the attorney-client
relationship that they might have otherwise offered at trial. The judge's statements were
made in an exchange with counsel during presentation of plaintiffs' case in chief. The court
was not announcing any findings on any issue being tried before it when it made the
statements. Because the trial court issued separate findings of fact and conclusions of law,
the trial court's statements made during the presentation of the evidence are given no effect
on the judgment. Tate, 55 S.W.3d at 7 n.4. Issue one is overruled.

SUFFICIENCY ISSUES


STANDARDS OF REVIEW


 Findings of fact entered in a case tried to the court have the same force and dignity
as a jury's answers to jury questions. Anderson v. City of Seven Points, 806 S.W.2d 791, 794
(Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency
of the evidence to support them by the same standards that are applied in reviewing evidence
supporting a jury's answer. See Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina
v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994). 

 A legal sufficiency challenge may only be sustained when: (1) the record discloses
a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence
establishes conclusively the opposite of a vital fact. Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally sufficient
evidence to support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless
a reasonable factfinder could not. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). 
"Anything more than a scintilla of evidence is legally sufficient to support the finding." 
Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence
furnishes some reasonable basis for differing conclusions by reasonable minds about the
existence of a vital fact. Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 77
S.W.3d 253, 262 (Tex. 2002). 

 When a party attacks the factual sufficiency of an adverse finding on an issue on
which he has the burden of proof, he must demonstrate on appeal that the adverse finding is
against the great weight and preponderance of the evidence. Croucher, 660 S.W.2d 55, 58
(Tex. 1983). The court of appeals must consider and weigh all of the evidence and can set
aside a verdict only if the evidence is so weak or if the finding is so against the great weight
and preponderance of the evidence that it is clearly wrong and unjust. See Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). In doing so, the court of appeals must "detail
the evidence relevant to the issue" and "state in what regard the contrary evidence greatly
outweighs the evidence in support of the verdict." Dow Chemical Co. v. Francis, 46 S.W.3d
237, 242 (Tex. 2001) (quoting Pool, 715 S.W.2d at 635). 

 We review conclusions of law de novo, and the standard of review is whether they are
correct. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002);
Material P'ships, Inc. v. Ventura, 102 S.W.3d 252, 257 (Tex. App.--Houston [14th Dist.]
2003, pet. denied). We will uphold conclusions of law on appeal if the judgment can be
sustained on any legal theory supported by the evidence. Material P'ships, 102 S.W.3d at
257. As such, any incorrect conclusions of law will not require reversal if the controlling
findings of fact support the judgment under a correct legal theory. Id. 

APPLICATION


 Issue seven reads, "Was the trial court's finding, that the Gordons failed to meet their
burden to support any of their alleged causes of action . . . , so contrary to the overwhelming
(or great) weight and preponderance of the evidence as to be clearly wrong and manifestly
unjust?" The trial court's Finding of Fact Number Five makes the broad statement,
"Plaintiffs failed to meet their burden to support any of their alleged causes of action." This
rather global issue is attached to three separate groups of issues discussed in appellants' brief. 
It does not contain distinct argument and authorities independent of the other appellate
issues. As such, it is subsumed within each separate issue and therefore, issue seven is
sustained only to the extent a separate appellate issue is sustained and issue seven is
overruled to the extent a separate appellate issue is overruled. 

ATTORNEY-CLIENT RELATIONSHIP


 Issues one through five include "great weight" challenges to the factual sufficiency
of the court's finding that appellants failed to prove an attorney-client relationship or an
otherwise resulting formal fiduciary relationship. The law is well-settled that an attorney-client relationship is a contractual relationship in which an attorney agrees to render
professional services for a client, and the relationship may be established either expressly or
impliedly from the conduct of the parties. Mellon Serv. Co. v. Touche Ross & Co., 17
S.W.3d 432, 437 (Tex. App.--Houston [1st Dist.] 2000, no pet.); Vinson & Elkins v. Moran,
946 S.W.2d 381, 405 (Tex. App.--Houston [14th Dist.] 1997, writ dism'd by agr.); Byrd v.
Woodruff, 891 S.W.2d 689, 700 (Tex. App.--Dallas 1994, writ dism'd by agr.). To establish
the relationship, the parties must explicitly or by their conduct manifest an intention to create
it. See Parker v. Carnahan, 772 S.W.2d 151, 156 (Tex. App.--Texarkana 1989, writ denied). 
To determine if there was an agreement or meeting of the minds one must use objective
standards of what the parties said and did and not look to their subjective states of mind. 
Bright v. Addison, 171 S.W.3d 588, 596 (Tex. App.--Dallas 2005, pet. dism'd).

 It is not disputed that there was no written contract establishing a formal attorney-client relationship. The record shows that Greg and David shared a close relationship as
brothers and had previously been business partners. Additionally, David had represented
Greg and Lisa as their attorney in the past and held a power of attorney for Greg. Greg, Lisa,
and Greg's and David's parents, Darla and George David Gordon, Sr., all testified that they
were under the impression that David was representing Greg and Lisa throughout the
transaction as their personal attorney. Greg and Lisa also stated that David represented to
them that he would coordinate the preparation of all of the documentation necessary to take
their company public. David, on the other hand, testified that he was only entitled to a
finder's fee for merging the two companies and raising capital within the newly formed
public corporation. At various times before and during the period of time at issue, David
represented other corporations involved in the merger and acquisition of shell corporations,
some of which were wholly or only partly involved with the merger and acquisition of Con-Tex. 

 David confirmed that he initiated the discussions with Greg and Lisa concerning the
proposal to take their company public and insuring they would be super-majority
shareholders in order to maintain control of the new corporation. David also admitted to 
further discussions with Lisa about transferring her shares in Con-Tex to Greg to facilitate
the plan to take Con-Tex public. David admitted that he reached an agreement with Greg and
Lisa that Greg would be issued 75 million shares to equal seventy percent ownership of the
new corporation. David testified while he negotiated a fee for his services in the amount of
ten percent of Greg's shares during a discussion between David, Greg, Lisa and George
Gordon, Sr., it was a finder's fee and not an attorney's fee. Nevertheless, David disclaimed
any responsibility in the representation of Greg in his sale of shares in Con-Tex to Transun,
the very first activity in initiating the plan to take Con-Tex public. David further testified
that while he normally makes his attorney's fees by drafting the documentation for these
"shell deals," David denied drafting any of the documents involved in the Con-Tex/Transun
merger and stock offerings. Notably, the only evidence introduced at trial showed that
nonlawyers, either employed by David or who shared David's law office space, actually
prepared drafts of the documents for David's review. David refused, though, to accept
responsibility for the work of Jesse Clayton and Susan Willis for the faulty draftsmanship of
the documents used in the transactions at issue. At appellants' request, the trial court took
judicial notice of an order of the bankruptcy court that found no attorney-client relationship
existed between David and Greg with respect to this transaction.

 When a party challenges a finding regarding an issue upon which that party had the
burden of proof, the appellant must demonstrate on appeal that the adverse finding is against
the great weight and preponderance of the evidence. Dow Chem. Co., 46 S.W.3d at 242. 
"The court of appeals must consider and weigh all of the evidence, and can set aside a verdict
only if the evidence is so weak or if the finding is so against the great weight and
preponderance of the evidence that it is clearly wrong and unjust." Id. "In reviewing the
evidence, we accord due deference to the trial court, which, as the trier of fact presented with
conflicting testimony, is the sole judge of the credibility of the witnesses and the weight to
be given their testimony." Akers v. Stevenson, 54 S.W.3d 880, 884 (Tex. App.--Beaumont
2001, pet. denied) (citing McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex.1986)). The
court, as trier of fact, is free to believe one witness and disbelieve others, and the court may
resolve inconsistencies in a witness's testimony. Id.. "We may not substitute our opinion for
that of the trier of fact." Transmission Exch. Inc. v. Long, 821 S.W.2d 265, 271 (Tex. App.--Houston [1st Dist.] 1991, writ denied). 

 In reviewing the evidence, while there is assuredly some evidence of an attorney-client relationship, we cannot say that the evidence supporting the finding of no relationship
is so weak or the finding is so against the great weight and preponderance of the evidence
that it is clearly wrong and manifestly unjust. Therefore, issues one and two are overruled
as they pertain to the trial court's finding that appellants failed to prove an attorney-client
relationship existed between appellants and David. Likewise, in view of the court's finding
that no attorney-client relationship existed, issues three, four, and five are overruled in part
as they pertain to a formal fiduciary relationship, as the trial court could have found that no
formal fiduciary relationship existed between the parties as a matter of law.

 Further related to this finding is issue ten in which appellants complain of the trial
court's failure to find for them on their claims of negligence and gross negligence with
respect to their ownership of shares in SGD. In their pleadings, plaintiffs assert these claims
in the form of legal malpractice for alleged misrepresentations involving 1) the attributes of
Transun, 2) the potential financial return and percentage of ownership they would receive in
exchange for their stock in Con-Tex, and 3) the effects of a one for six reverse stock split on 
plaintiffs' ownership interest in SGD. Generally, to recover on a claim of legal malpractice,
a plaintiff must prove, among other things, that the attorney owed the plaintiff a duty and that
he breached that duty. Greathouse v. McConnell, 982 S.W.2d 165, 172 (Tex. App.--Houston
[1st Dist.] 1998, pet. denied). In a legal malpractice claim based on negligence, the focus is
whether the attorney provided bad legal advice or otherwise improperly represented the
client. See Aiken v. Hancock, 115 S.W.3d 26, 28 (Tex. App.--San Antonio 2003, pet. denied)
(citing Greathouse, 982 S.W.2d at 172). Because the trial court could reasonably find that
appellants failed to prove an attorney-client relationship existed between appellants and
David, the trial court could also reasonably find that appellant failed to prove the existence
of any duty to give sound legal advice. Issue ten is overruled.

FIDUCIARY RELATIONSHIP


 Plaintiffs, in issues one through five, also complain of the trial court's failure to find
an informal fiduciary relationship existed between David and plaintiffs. Additionally, issues
thirteen through fifteen and issue eighteen complain of the trial court's failure to find David
fraudulently misrepresented, or omitted to disclose, certain material facts to plaintiffs. As
the existence of an informal fiduciary relationship implicates these issues, we include them
in our analysis.

 At common law, the word "fraud" refers to an act, omission, or concealment in breach
of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another
or the taking of an undue and unconscientious advantage. See Russell v. Indus. Transp. Co.,
113 Tex. 441, 258 S.W. 462, 463 (1924); Flanary v. Mills, 150 S.W.3d 785, 795 (Tex. App.--Austin 2004, pet. denied). One such "legal duty" is imposed when a fiduciary relationship
has been established. A fiduciary relationship is said to exist when one person has a duty to
act for or give advice for the benefit of another within the scope of the relation. Kline v.
O'Quinn, 874 S.W.2d 776, 786 (Tex. App.--Houston [14th Dist.] 1994, writ denied). In a
fiduciary relationship, one person "binds himself to subvert his own interest to those of his
principal." Walker v. Fed. Kemper Life Assur. Co., 828 S.W.2d 442, 452 (Tex. App.--San
Antonio 1992, writ denied). 

 The specific kinds of relationship in which these higher standards apply may be
determined as a matter of law or as a matter of fact. As a matter of law, attorneys owe
fiduciary duties to their clients, partners in a general partnership owe each other fiduciary
duties, and general partners in a limited partnership owe fiduciary duties to the limited
partners. See Thigpen v. Locke, 363 S.W.2d 247, 253 (Tex. 1962); Brazosport Bank of Tex.
v. Oak Park Townhouses, 889 S.W.2d 676, 683 (Tex. App.--Houston [14th Dist.] 1994, writ
denied). As a matter of fact, a fiduciary duty may be found if evidence establishes that one
has placed special confidence in another where the latter is bound, in equity and good
conscience, to act in good faith and with due regard to the interests of the other; or when
special confidence is reposed in one who, thereby, obtains a resulting superiority of position
and influence. See, e.g., Consol. Gas & Equip. Co. of Am. v. Thompson, 405 S.W.2d 333,
336-37 (Tex. 1966); Thigpen, 363 S.W.2d at 253; Peckham v. Johnson, 98 S.W.2d 408, 416
(Tex. Civ. App.--Fort Worth 1936), aff'd, 132 Tex. 148, 120 S.W.2d 786 (1938). Thus,
fiduciary relationships may arise "from moral, social, domestic or purely personal
relationships." Thigpen, 363 S.W.2d at 253. However, to establish this "confidential" or
"informal" fiduciary relationship, a party must show that the special relationship of trust and
confidence existed prior to, and apart from, any purported agreement made the basis of the
current suit. See Associated Indem. Corp., 964 S.W.2d at 288; Schlumberger Tech. Corp.,
959 S.W.2d at 177. A family relationship, while it is considered as a factor, does not, by
itself, establish a fiduciary relationship. See Tex. Bank & Trust Co. v. Moore, 595 S.W.2d
502, 508 (Tex. 1980). An informal fiduciary relationship may be found to exist when proof
indicates that "'influence has been acquired and abused, in which confidence has been
reposed and betrayed.'" Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823
S.W.2d 591, 594 (Tex. 1992) (quoting Tex. Bank & Trust Co., 595 S.W.2d at 507). 

 If a relationship between parties is a fiduciary relationship, as a matter of fact or of
law, the law imputes to the relationship additional and higher duties, and their breach may
constitute actionable fraud as well. See Chien v. Chen, 759 S.W.2d 484, 495 (Tex. App.--Austin 1988, no writ). This includes a general duty of full disclosure regarding matters
affecting the principal's interests and a general prohibition against the fiduciary's use of the
relationship to benefit his personal interest, except with full knowledge and consent of the
principal. Id.

 We now determine whether an informal or confidential fiduciary relationship, that
arises from a moral, social, domestic, or merely personal relationship where one person trusts
in and relies upon another, existed between appellants and David. See Crim Truck &
Tractor, 823 S.W.2d at 594. The determination of the existence of a confidential relationship
is normally for the trier of fact. Hoggett v. Brown, 971 S.W.2d 472, 488 (Tex. App.--Houston [14th Dist.] 1997, pet. denied). Appellants complain that the trial court's failure to
find such an informal or confidential fiduciary relationship is so against the great weight and
preponderance of the evidence as to be manifestly unjust.

 The record before us does not present an arms-length business transaction, where each
party relies on the other to simply perform the terms of a contract. Instead, the record shows
that Greg and David shared a close relationship and had previously been business partners. 
The record also demonstrates that David had previously provided legal representation to Greg
and Lisa and held a power of attorney on Greg's behalf with regard to other legal
representation. Additionally, David was known and respected by his brother and sister-in-law as an attorney who successfully specialized in mergers and acquisitions. Greg and his
father, himself a practicing attorney, both testified that the subject of taking Con-Tex public
first arose during the Christmas holidays of 1998. While disputing the exact time and
circumstance that the subject arose, David admitted that it was he who initiated the
discussions with Greg and Lisa regarding taking Con-Tex public. There was testimony that
David visited with Greg and Lisa about their company whenever he came to Conroe, even
prior to the discussions to take their company public. David, using his knowledge and
training in the law and experience acquired through years of trading and selling shells,
identified the opportunity and purposefully sought the confidence of plaintiffs to utilize the
assets of Con-Tex, even if it be for mutual gain. Greg and Lisa both testified that David told
each of them that he was going to act as their attorney and prepare the documents concerning
the transaction. Greg added that David instructed Lisa and him that during the process of
accomplishing their objective, they were to continue doing what they had been doing, selling
jewelry. However, soon after the stock purchase agreement was signed to begin the process
of taking Con-Tex public, Jesse Clayton, then acting as president and sole director of 
Goldonline (the public corporate entity created by the reverse acquisition of Con-Tex by
Transun) suffered a debilitating stroke. Because Clayton was unable to work, David decided
to substitute Greg as president and sole director of Goldonline. David would later admit that
he never explained to Greg what his responsibilities would be with respect to managing the
publicly traded company. William Dark, a trusted family friend and eventually a director of
SGD, testified that while Greg was the designated figurehead of the company, the de facto
person running the company was David. Greg stated that in the beginning, he neither
realized the responsibilities associated with the office of an executive officer of a public
corporation nor did he receive advice necessary to properly exercise his authority as
president. In fact, he testified that his day to day duties and responsibilities never really
changed from that of selling jewelry. The record is replete with incidents where David
would have documents prepared and faxed to Greg for his signature without Greg having any
understanding of what he was signing. In other instances David would simply sign Greg's
name as president of the corporation. During trial and in the issued findings and conclusions,
much attention and criticism was directed at Greg for his role as president, director, and
majority stockholder of SGD, as well as his failure to act on his own behalf despite his titles
allowing him such authority. However, the record evidence revealed that it was Greg's
attempt to educate himself and exercise such authority that eventually led to his separation
from the corporate entities and the loss of his and his wife's jewelry business and investment.

 Lisa Gordon provided compelling testimony on the issue of an informal fiduciary
relationship. She and her mother-in-law, Darla, originally started Con-Tex and had worked
hard to build up the company. Greg came into the company later and the business continued
to grow. At the time the idea of taking Con-Tex public arose, Lisa and Greg were equal
owners of the stock. Lisa testified that David spoke with her and advised her that it would
be necessary for her to transfer her shares in Con-Tex to Greg to avoid claims of nepotism
after the reverse acquisition into the newly formed public corporation. Lisa testified that
David emphatically stated that he would protect Greg and her and that David would be their
attorney. Convinced by David's representations that as her brother-in-law who was trained
in the law and specialized in these types of transactions, he would protect her interests, Lisa
acquiesced and surrendered all her interest in the company which she had worked to build. (9)
She relied upon David to represent her best interests.

 After the reverse acquisition, David continued to advise Greg and Lisa regarding the
SEC restrictions on the ability of insiders to sell shares of stock in a public corporation. In
the initial discussions to obtain Greg's and Lisa's participation in this shell deal, David
represented to Greg and Lisa that after the first year following the merger, they would be able
to sell up to one million dollars of stock and then a certain percentage every three months
thereafter. Lisa asserted that she and Greg trusted David and relied upon him to advise them
correctly because they were depending on him as their lawyer. Lisa testified, "I thought he
knew what he was talking about because he was the SEC lawyer, not me." 

 The record shows that in the Autumn of 2000, Greg and Lisa desired to build a home. 
David told them that SEC regulations prohibited them from selling any stock at that time, but
David promised to position Greg and Lisa so that they could begin selling their stock on the
open market. About every six months, Greg and Lisa spoke to David about selling stock but
he kept putting them off, advising them that SEC regulations prohibited any sale of stock by
them. In 2001, David promised Lisa, in the presence of his mother, that by Christmas of that
year, Greg and Lisa would be able to sell at least $500,000 worth of their stock on the open
market. However, at Christmas, David maintained once again that they could not sell their
shares because of SEC regulations. David never allowed Greg and Lisa to sell any of their
stock before the company filed bankruptcy. David never refuted this testimony.

 After a review of all of the evidence in this matter, we hold that the trial court's
finding that plaintiffs' failed to prove an informal or confidential fiduciary relationship
between themselves and David is so against the great weight and preponderance of the
evidence as to be clearly wrong and manifestly unjust. Therefore, the trial court erred in
failing to find an informal fiduciary relationship. 

 Appellants further complain that the trial court erred when it found: (1) that David did
not make actionable negligent misrepresentations to appellants and that appellants failed to
meet their burden of proof to support any of their causes of action; (2) that appellants failed
to present any credible evidence that they--in their individual capacity--reasonably relied
upon or were misled by any statement or action of David; and (3) that David did not
knowingly make any material, false, or fraudulent statements to induce appellants to enter
into any transactions with SGD. Appellants claim the trial court's findings and conclusions
are so against the great weight and preponderance of the evidence as to be clearly wrong and
manifestly unjust. In Finding of Fact Number Five, the trial court found that appellants failed
to meet their burden to support any of their alleged causes of action. More specifically, the
trial court found that appellants presented no credible evidence that they, in their individual
capacities, reasonably relied upon or were misled by any statement or action of David. The
trial court additionally found that David did not knowingly make any material, false, or
fraudulent statements to induce appellants to enter into any transactions. In its Conclusion
of Law Number One, the trial court found that there was not sufficient credible evidence that
David made negligent misrepresentations with respect to the appellants' shares or that he
otherwise engaged in any other conduct that was a producing cause of actual damages to 
appellants. 

 "Negligent misrepresentation" is proven by evidence of the following: (1) a
representation is made by the defendant to the plaintiff in the course of the defendant's
business, or in a transaction in which the defendant has a pecuniary interest; (2) the defendant
supplies false information for the guidance of others in their business; (3) the defendant did
not exercise reasonable care or competence in obtaining or communicating the information;
and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. See
E.R. DuPuis Concrete Co. v. Penn Mut. Life Ins. Co., 137 S.W.3d 311, 321 (Tex. App.--Beaumont 2004, no pet.) (citing Fed. Land Bank Ass'n v. Sloane, 825 S.W.2d 439, 442 (Tex.
1991)). Professionals may owe a duty to a nonclient when the professional knows a
nonclient will rely on a misrepresentation made to the nonclient and the professional intends
for the nonclient to rely on the misrepresentation. See McCamish, Martin, Brown & Loeffler
v. F. E. Appling Interests, 991 S.W.2d 787, 792-93 (Tex. 1999). The duty owed by the
professional to the nonclient under a negligent misrepresentation action is not based on the
privity of their relationship, for example, an attorney-client relationship. Id. at 792. A cause
of action for negligent misrepresentation does not require proof of knowledge of the falsity
or reckless disregard of the truth or falsity of the representation at the time it was made, but
only a failure to exercise reasonable care in obtaining or communicating the information. 
Compare Johnson, 73 S.W.3d at 211 n.45 (elements of common law fraud require actor's
knowledge or reckless disregard), with Fed. Land Bank Ass'n, 825 S.W.2d at 442.

 Texas has adopted section 552 of the Restatement (Second) of Torts concerning the
theory of negligent misrepresentation, specifically applying to lawyers. McCamish, 991
S.W.2d at 791 (citing Restatement (Second) of Torts § 552 (1977) (addressing the issue
in the context of misrepresentations by a law firm)). This theory permits plaintiffs who are
not parties to a contract to recover from the contracting parties:

 Under the tort of negligent misrepresentation, liability is not based on the
breach of duty a professional owes his or her clients or others in privity, but on
an independent duty to the nonclient based on the professional's manifest
awareness of the nonclient's reliance on the misrepresentation and the
professional's intention that the nonclient so rely.


Id. at 792. Accordingly, in McCamish, lack of privity between the parties did not preclude
a cause of action for negligent misrepresentation brought by a nonclient against the law firm. 
Id. at 795. Nevertheless, the prong of justifiable reliance limits liability "to situations in
which the attorney who provides the information is aware of the nonclient and intends that
the nonclient rely on the information." Id. at 794. In other words, the cause of action is
available only when information is transferred to a known party for a known purpose. 

 Appellants complain in this lawsuit that David had physical possession of their stock
certificates in SGD and would not allow them access to the certificates or allow them to sell
any of their shares. Yet, the trial court was critical of Greg in that he was president, director,
and super-majority shareholder of SGD. The trial court also criticized Greg for his
knowledge that Olde Monmouth was the transfer agent for SGD but that Greg failed to act
on his own behalf to have the transfer agent issue his shares directly to him. David testified
and documentary evidence showed that David instructed Olde Monmouth to issue and deliver
Greg's shares in the corporation to David, "for me to hold until they could be sold at the
proper time." There was conflicting testimony from David, he stated he did not have
possession of the share certificates but then admitted he did have the share certificates. In
any case, the record shows that the shares were issued with a restrictive legend, prohibiting
their unrestricted transfer. Both appellants testified that David represented to them that they
would be able to sell a certain number of shares or a certain value of their total shares after
an initial one-year waiting period because of their insider status. The court took judicial
notice of the specific SEC regulation regarding insider trading. As set forth hereinbefore,
it is not refuted that, despite the plain wording of the regulation, after the one-year holding
period had expired, David continuously advised Greg and Lisa that SEC regulations would
not allow them to sell any of their shares. David knew his brother and sister-in-law would
rely upon his representations and not attempt to sell any SGD shares on the open market. At
no time were plaintiffs able to sell any shares before the corporation filed bankruptcy. 

 Record evidence showed that just prior to the acquisition and merger with Con-Tex,
there was no active trading in the shares of Transun on the open market. Apparently, when
"trading and selling shells," press releases are issued and circulated with favorable
descriptions of the mergers and acquisitions of the corporate entities to stimulate trading in
the market and to increase the price of the new shares. Immediately after the press release
regarding the Con-Tex merger and acquisition was publicized, trading in the public
corporation suddenly began on the open market at approximately fifty cents per share. 

 Shortly after the merger with Con-Tex, the publicly traded company offered a private
placement of shares and there were a number of investors who subscribed and purchased
shares in the corporation for twenty-five cents per share. These investors were individuals
and entities controlled by individuals who regularly participated with David in "trading and
selling shells." However, following Clayton's debilitating stroke in late June 1999, share
certificates were not issued promptly to these purchasers. To compound things further, in
July or August 1999, David received a phone call from the FBI informing him of an SEC
investigation into the new activity in Transun. By that time, stock prices had fallen to five
or six cents per share and the company had still not issued the share certificates to those
purchasers who had originally purchased the shares for twenty-five cents. To avoid further
problems, David reportedly approached the initial subscribers and proposed a reverse stock
split and a new subscription agreement to issue shares to them on a post-split basis. (10) But,
David was not able to determine the number to use for the reverse split until the stock prices
bottomed out. 

 David testified he had a different agreement with Greg from the other investors. 
Allegedly, they reached an oral agreement that Greg would still be issued 75 million shares
pending the outcome of the SEC investigation. If the SEC investigation proved to have no
claims against Transun, Greg's shares would then be subjected to the reverse split. Greg
asserted that the first time David discussed with him that his shares needed to be subjected
to the reverse split was in February 2002. At that time, David allegedly told Greg that since
the SEC investigation had found no fault with Transun, there was no reason not to subject
Greg's 75 million shares to the reverse split. In a letter dated October 25, 2002, David, as
counsel for SGD, instructed Olde Monmouth to subject Greg's shares to the reverse stock
split. Regardless of the propriety of the decision or procedures utilized to attempt to subject
Greg's shares to the reverse stock split, it is at least circumstantial evidence that David never
intended for Greg and Lisa to be able to sell any of their stock until that issue was resolved. 
 David further admitted that he approached Terry Washburn, an independent director
of Goldonline appointed in the summer of 2000, and received approval from Washburn to
instruct Olde Monmouth to place a freeze on Greg's stock to prohibit him from selling or
otherwise transferring any of his shares in the corporation. Therefore, while the court was
critical of Greg for not instructing Olde Monmouth to reissue his shares directly to him, any
such attempt would have been ineffective. David never disclosed this to Greg or Lisa but
rather, always maintained that they were prohibited from selling their stock because of SEC
regulations. Testimony from Washburn opined that if Greg had been given access to his
shares and sold them when he initially wanted to, the price of the shares would have
"plummeted." 

 While Greg was not allowed to sell or trade his shares, David and those associated
with him in "trading and selling shells," who purchased shares and warrants in the initial
offering in 1999, were freely transferring shares for their own purposes. David, using shares
allegedly issued in the names of his father and mother, repeatedly had certificates reissued
and transferred tens of thousands of shares in numerous transactions from and after
November 1999. Richard Clark transferred shares in 2000. Lakewood Development and
Mark White reportedly sold 4.5 million and 150,000 shares, respectively, in 2001. Brian
John actively transferred his shares through at least October 2002. Plaintiffs introduced
evidence at trial of SGD's stock ledger and the transfer agent's records evidencing the
various stock transactions of these individuals from and after the initial offering in 1999.

 Considering all of the record-evidence, we conclude the trial court's findings that
"Plaintiffs presented no credible evidence that Defendant G. David Gordon, Jr. . . . breached
a duty owed by virtue of a confidential relationship with Defendant G. David Gordon, Jr. .
. . [and] did not breach [] any legal, fiduciary duty . . . owed to Plaintiffs," that there was not
sufficient credible evidence that David made negligent misrepresentations that was a
producing cause of actual damages to appellants and, that appellants failed to present any
credible evidence that appellants - in their individual capacity - reasonably relied upon or
were misled by any statement or action of David are so against the great weight and
preponderance of the evidence as to be clearly wrong and manifestly unjust. Golden Eagle
Archery, Inc. v. Jackson, 116 S.W.3d 751, 761-62 (Tex. 2003); Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986). We sustain issues four, five, and seven insofar as they pertain to
appellants' claim for breach of informal fiduciary duty and breach of confidential
relationship.

 The final element in a breach of fiduciary duty action is "the defendant's breach must
result in injury to the plaintiff, or benefit to the defendant." Punts, 137 S.W.3d at 891. 
Generally, breach of fiduciary duty is an independent tort that will support the award of
actual damages. See Manges v. Guerra, 673 S.W.2d 180, 184 (Tex. 1984); Kahn v. Seely,
980 S.W.2d 794, 799 (Tex. App.--San Antonio 1998, pet. denied); see also Comm. on
Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business,
Consumer, Insurance, Employment PCJ 110.18 (2006). A plaintiff may also recover
exemplary damages in an action for breach of fiduciary duty, if the breach is intentional. See
Int'l Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 583-84 (Tex. 1963); Brosseau v.
Ranzau, 81 S.W.3d 381, 396 (Tex. App.--Beaumont 2002, pet. denied). 

 Related to this damage element are issues eight and nine, which ask for evidentiary
review of the trial court's finding and conclusion that Greg was in a position to have
prevented the damages he alleged and that Greg's failure to act on his behalf in certain
circumstances "was the proximate cause of his own fate." Conclusion of Law Number Four
reads as follows: 

 Finally, the Court concludes that there is sufficient evidence that the
Plaintiff, G. Gordon, had the ownership, the authority and power as director,
as majority stock owner, and corporate officer to prevent the damages for
which he claims he suffered. In many ways, the Plaintiff's failure to act on his
own behalf was the proximate cause of his own fate. The Court concludes that
this action filed by Plaintiff's [sic] as individuals is an attempt to circumvent
the estoppel of a derivative shareholder action which may or may not be valid.


Conclusions of law are to be the court's statement of the legal principles it applied to the
facts to resolve the case. See Dallas Morning News Co. v. Bd. of Trustees of Dallas Indep.
Sch. Dist., 861 S.W.2d 532, 536 (Tex. App.--Dallas 1993, writ denied). The nearest legal
principle associated with these statements would be a failure to mitigate damages. However,
the failure to mitigate damages is an affirmative defense. See Taylor Foundry Co. v. Wichita
Falls Grain Co., 51 S.W.3d 766, 774 (Tex. App.--Fort Worth 2001, no pet.). The affirmative
defense of failure to mitigate damages was not pled. Instead, the statements are more akin
to findings of fact and thus, will be treated accordingly. When findings of fact are included
among the trial court's conclusions of law, we review them as findings of fact. See Lewis
v. Dallas Soundstage, Inc., 167 S.W.3d 906, 912 (Tex. App.--Dallas 2005, no pet.).

 As discussed earlier, plaintiffs approached David periodically after the one-year
anniversary date requesting that they be permitted to sell some amount of their shares in the
corporation, but David repeatedly represented to them that they were not permitted to sell
any shares because of SEC regulations. Plaintiffs' Exhibit 14, a copy of SGD's stock chart,
and Plaintiffs' Exhibit 97, both admitted without objection, are Excel spreadsheets, and both
list the price of SGD's shares at various dates and further evidence that David and other
persons associated with David "trading and selling shells" traded and sold SGD shares on the
open market. In correlation to the SEC rule addressing insider trading, Plaintiffs' Exhibits
265 and 278, Form 10k government filings, were admitted to evidence the number of shares
of SGD outstanding as of September 10, 2000, the date on which plaintiffs were legally able
to sell or transfer shares in the corporation owned by them. The SGD stock chart indicates
that David personally transferred a large number of shares to various individuals and
corporate entities, and the record contains evidence indicating David's relationship to some
of the individuals and corporate entities listed as receiving those shares. David's appellate
brief fails to direct our attention to nor have we found any record-evidence explaining his
extensive trading of SGD shares a mere two months after issuance that continued through the
next two years, without restriction, while at the same time David advised Greg and Lisa that
they were prohibited from selling any of their shares by SEC regulations.

 Pertinent to the discussion here is the trial court's finding of fact that, "[p]laintiffs
knew Olde Monmouth was the transfer agent for their shares and that shares that were not
restricted were freely transferable and subject to sale by them at their election. At all times
Plaintiffs were entitled to take action on behalf of themselves and their own interests." 
Background evidence, however, appears to contradict this finding. As previously discussed,
it appears that just prior to Transun's acquisition of Con-Tex, Transun's shares were not
trading. Immediately after the issuance of a favorable press release regarding the
Transun/Con-Tex merger and acquisition, trading began on the open market at approximately
fifty cents per share. Plaintiffs' pleadings are sufficient to support a claim for damages for
loss of profits proximately caused by violation of a fiduciary duty and may be considered by
the trier of fact in any retrial of the causes remanded. Exemplary damages, if appropriate,
may also be considered. Issues one through five, eight, nine, thirteen through fifteen, and
eighteen through twenty are sustained.

 In issue eleven, appellants complain that the trial court's finding that the one-for-six
reverse stock split did not affect their majority position in SGD is against the great weight
of the evidence. However, the trial court took judicial notice of the federal bankruptcy
court's ruling in the separate action, James Gregory Gordon and Lisa Kay Gordon v. SGD
Holdings, Ltd., adversary proceeding number 05-04063, dated May 6, 2005, which states that
at all times relevant to the determination of the issue, "Greg has owned 75 million shares of
SGD and continues to own 75 million shares of SGD to this date." Additionally, the
bankruptcy judge ruled that not only is Greg entitled to the 75 million shares of SGD, but that
"there is no affirmative defense or equitable reason why Greg should not be entitled to assert
that ownership." As the bankruptcy court essentially ruled that no reverse stock split of
Greg's shares ever occurred, issue eleven is moot and we overrule same.

 In issue twelve, appellants complain that the trial court erred in its Conclusion of Law
Number One (vi) that "[t]here is not sufficient credible testimony or documentary evidence
that Defendant, G. David Gordon, Jr. . . . (vi) converted or otherwise exercised dominion or
control over Plaintiffs' shares[.]" No legal principle seems to be associated with this
statement and therefore, we treat this as a finding of fact which coincides with Finding of
Fact Number Ten, wherein the trial court found:

 Defendant G. David Gordon, Jr. did not have the authority to on [sic],
dominion, or control over Plaintiffs' share certificates in SGD. At all times
Plaintiffs knew Olde Monmouth was the transfer agent for their shares and that
shares that were not restricted were freely transferable and subject to sale by
them at their election. At all times Plaintiffs were entitled to take action on
behalf of themselves and their own interests. Defendant G. David Gordon, Jr.
did not have the authority to prevent them from doing so.


"Conversion is defined as the wrongful exercise of dominion and control over another's
property in denial of or inconsistent with his rights." Green Int'l, Inc. v. Solis, 951 S.W.2d
384, 391 (Tex. 1997). Certainly, shares of stock can be converted. See, e.g., Earthman's Inc.
v. Earthman, 526 S.W.2d 192, 204 (Tex. Civ. App.--Houston [1st Dist.] 1975, no writ).

 The record shows that David testified and documentary evidence showed that David
instructed Olde Monmouth to issue and deliver Greg's shares in the corporation to David "to
hold until they could be sold at the proper time." David further testified that he told the
bankruptcy examiner that he was in possession of Greg's share certificates. Finally,
Plaintiffs introduced a letter from October 2002, from David to Olde Monmouth, instructing
it to cancel Greg's original share certificates and issue new certificates subjecting Greg's
shares to the reverse split. David admitted that Olde Monmouth would have required the
original certificates before it would have been able to cancel and issue new certificates,
providing further evidence that David was, at all times, in possession of Greg's certificates. 
While the trial court found that plaintiffs knew that the shares that were not restricted were
freely transferable and subject to sale by them at their election, the record shows that Greg's
share certificates contained a restrictive legend and therefore, plaintiffs were not freely
transferable or subject to sale by them. Finally, to prohibit Greg from taking action directly
with the transfer agent to exercise control over his shares of stock, David testified that he
contacted Olde Monmouth and put a freeze upon Greg's stock at some time after August
2000, to prohibit Greg from selling or otherwise exchanging his shares. While appellants
demanded return of the original certificates or otherwise attempted to have the transfer agent
issue new certificates to Greg, the certificates were not released or otherwise reissued. As
a result of David's actions, appellants were never able to sell any shares of their stock in the
corporation before it filed for bankruptcy protection. Evidence introduced to the court
showed the value of the stock at various dates from the date Greg's share certificates were
initially issued through the date the corporation filed bankruptcy. 

 Considering all of the record evidence, we conclude the trial court's Finding of Fact
Number Ten and Conclusion of Law Number One (vi), and Finding of Fact Number Five,
to the extent it pertains to the cause of action for conversion, are so against the great weight
and preponderance of the evidence as to be clearly wrong and manifestly unjust. See Golden
Eagle Archery, 116 S.W.3d at 761-62; Cain, 709 S.W.2d at 176. Issue twelve is sustained.

 Finally, issue twenty-one complains of the failure to admit a recording of a
conversation with Jesse Clayton. The recording was marked as Plaintiffs' Exhibit 193, and
was objected to by David's counsel on grounds of hearsay. Plaintiffs' counsel argued that
since Clayton had been shown to be David's agent, Clayton's statements on the recording,
which were purported to directly contradict David's position and prior deposition testimony
on certain issues, were not hearsay. Texas Rules of Evidence 801(e)(2)(D) provides that an
out-of-court statement by a party's agent offered against the party is not hearsay. However,
the rule also requires that the agent's statement must concern a matter within the scope of the
agency or employment and must be made during the existence of the agency or employment
relationship. Tex. R. Evid. 801(e)(2)(D) . In the instant case, the only testimony presented
as to Clayton's relationship with David was that David employed Clayton as a "contract
laborer" that rented office space from David. Plaintiffs failed to show that the statements by
Clayton related to matters within the scope of Clayton's employment, if any, by David. See
Handel v. Long Trusts, 757 S.W.2d 848, 851 (Tex. App.--Texarkana 1988, no writ). Issue
twenty-one is overruled. 

 In conclusion, we restate our rulings on the appellate issues presented: we overrule
issues six, seven in part, ten, eleven, sixteen, seventeen, and twenty-one. We sustain issues
one through five, as they pertain to breach of informal fiduciary relationship, eight, nine,
twelve (conversion), thirteen through fifteen (alternative cause of action for negligent
misrepresentation between professional and nonclient), and issue eighteen (common law
fraud based on evidence of fiduciary duty). Issues nineteen (actual damages) and twenty
(exemplary damages) are recoverable in a breach of fiduciary duty action. See Kahn, 980
S.W.2d at 799 (actual damages); Int'l Bankers Life Ins., 368 S.W.2d at 583-84; Brosseau, 81
S.W.3d at 396 (exemplary damages). We remand to the trial court the actions for breach of
informal fiduciary duty, conversion, negligent misrepresentation, common law fraud based
on evidence of a fiduciary duty, and the appropriate measure of damages, if properly proven. 
We therefore affirm the trial court's judgment in part and reverse and remand in part.

 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.



 __________________________________

 CHARLES KREGER

 Justice

Submitted on October 5, 2006

Opinion Delivered July 31, 2008


Before McKeithen, C.J., Kreger and Horton, JJ.

DISSENTING OPINION



 The majority concludes that the trial court's refusal to find favorably on Greg's 
breach of informal fiduciary relationship is contrary to the overwhelming great weight and
preponderance of the evidence. In my opinion, the majority's opinion does not reflect that
it conducted the required factual sufficiency review of the evidence. See Dow Chemical Co.
v. Francis, 46 S.W.3d 237, 242 (Tex. 2001) (reversing where court of appeals did not
conduct a proper factual-sufficiency review). 

 As discussed in the majority's opinion, this case involved extensive trial and
deposition testimony and numerous exhibits. The great majority of the testimony concerns
the transactions to take Greg's privately held corporation public and focuses on Greg's 
assertion that David's conduct caused Greg to retain his shares instead of selling them at a
time when he would have realized a gain. Greg and Lisa, the plaintiffs, pled multiple
theories of recovery. The trial court, on conflicting testimony, resolved the controlling fact
issues in David's favor, and entered a judgment that plaintiffs recover nothing. 

 In determining whether to impose a fiduciary duty based upon an informal fiduciary
relationship, the length of the parties' prior relationship is an important factor. Harris v.
Sentry Title Co., Inc., 715 F.2d 941, 948 (5th Cir.1983), cert. denied, 467 U.S. 1226, 104
S.Ct. 2679, 81 L.Ed.2d 874 (1984) (holding that the evidence was insufficient to show "that
the parties had a long-standing fiduciary or confidential, trusting relationship unrelated to the
subject transaction" to show a constructive trust, a type of judicially imposed fiduciary
relationship); Lee v. Hasson, No. 14-05-00004-CV, 2007 WL 236899, at *9 (Tex. App.-
Houston [14th Dist.] Jan. 30, 2007, pet. denied) ("The length of the relationship is another
important factor[.]"). With respect to their prior business relationship, Greg's brief fails to
provide any record cites to establish that a long-standing prior business relationship existed
to justify this court's creation of such a relationship. Schlumberger Tech. Corp. v. Swanson,
959 S.W.2d 171, 177 (Tex. 1997) ("[W]hile a fiduciary or confidential relationship may arise
from the circumstances of a particular case, to impose such a relationship in a business
transaction, the relationship must exist prior to, and apart from, the agreement made the basis
of the suit."). Texas Rule of Appellate Procedure 38.1(h) provides that the appellant's brief
"must contain a clear and concise argument for the contentions made, with appropriate
citations to authorities and to the record." 

 In this case, the trial court found the evidence insufficient to support the imposition
of an informal fiduciary relationship. I would not sift through the voluminous record looking
for the evidence of the parties' prior business relationship in order to overrule the decision
by the trial court; instead, I would hold that Greg failed to establish that the trial court
committed error. While the majority's opinion makes a general reference to the existence
of prior business transactions, it does not provide any relevant details, nor does it explain
how the evidence demonstrates that these prior transactions reasonably led Greg to expect
that David would only represent Greg's interests in this transaction. In my opinion, the
majority's discussion of Greg and David's prior business history is not sufficient to meet its
duties under Francis, under which we are required, before setting aside a verdict based on
a greater weight and preponderance argument, to "'detail the evidence relevant to the issue'
and 'state in what regard the contrary evidence greatly outweighs the evidence in support of
the verdict.'" Francis, 46 S.W.3d at 242 (citing Pool v. Ford Motor Co., 715 S.W.2d 629,
635 (Tex. 1986)). 

 Here, the evidence concerning whether David breached any duty by recommending
that Greg not sell his shares was also a disputed issue. While Greg did not sell at a time
when he might have received a favorable price, there was evidence during the time in
question of governmental investigations into the legality of the corporate transactions
creating SGD. In the face of these investigations, the trial court may have concluded that
David did not breach a duty to Greg by advising him to hold rather than to sell his stock. 

 The majority's opinion also does not sufficiently address the appropriate inferences
to be drawn from Greg's knowledge that David acted as SGD's corporate attorney from its
inception. Therefore, it is reasonable to infer that Greg knew, at the times material to the
issues here, that David was bound to act in the corporation's best interest. In my opinion, the
trial court could have reasonably concluded that Greg could not reasonably rely on David to
place Greg's personal interests above those of SGD's. 

 While evidence of a close family relationship can support a favorable finding to
impose an informal fiduciary duty, the evidence that Greg and David had such a close
relationship to allow a court to impose an informal fiduciary duty was a disputed fact. See
Tex. Bank & Trust Co. v. Moore, 595 S.W.2d 502, 508 (Tex. 1980) (holding that a familial
relationship itself cannot establish a fiduciary relationship). Where the evidence concerning
the existence of an informal fiduciary relationship is in conflict, the issue is a question of
fact. Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d 591, 594 (Tex.
1992). Evidence showing that "one businessman trusts another, and relies upon his promise
to perform a contract, does not rise to a confidential relationship." Id. at 594. 

 Where a trial court drew reasonable inferences from the evidence, an appeals court
cannot substitute its own opinion in place of the trial court's. City of Keller v. Wilson, 168
S.W.3d 802, 821-22 (Tex. 2005). Because the trial court drew reasonable conclusions from 
disputed facts, I would affirm the trial court's judgment. Because the majority does not, I
respectfully dissent.


 

 _____________________________

 HOLLIS HORTON

 Justice


Dissent Delivered

July 31, 2008
1. Although a jury was empaneled and heard a portion of the testimony, the parties
entered into a mid-trial agreement to dismiss the jury and permit the trial court to act as
ultimate factfinder. 
2. Under such circumstances, entry of a severance order is not required for the
proceedings to continue against the remaining defendants. In re Sw. Bell Tel. Co., 35 S.W.3d
at 604.
3. A "shell" corporation is a legal entity that has been created but which has little or no
assets and is usually not active. Black's law Dictionary 368 (8th ed. 2004).
4. This testimony is countered by the fact that Jesse Clayton was initially named as
president and sole director of the corporation until he suffered a debilitating stroke. It was
not until afterwards, when Clayton was physically unable to work, that David named Greg
as president and sole director of Goldonline.
5. Jesse Clayton acted as president of Transun and after the reverse acquisition of Con
-Tex, continued to act as president of Goldonline until his stroke, after which Greg Gordon
acted as president.
6. In the Bankruptcy Court Examiner's Report admitted as Plaintiffs' Exhibit 14, David
Gordon stated to the examiner that he prepared a draft of the Stock Purchase Agreement but
could not remember what further involvement he had in the transaction.
7. The trial court took judicial notice of Rule 144 of the Securities & Exchange
Commission, 17 C.F.R., section 230.144, which mandates a one-year holding period for
insiders and thereafter, provides for a limited number of shares of insider stock that can be
sold on a periodic basis.
8. In their written objections to David's proposed findings of fact and conclusions of
law, plaintiffs requested that their request for "declaratory judgment and specific
performance" be deleted from the proposed findings "because the Gordons did not seek such
relief against Defendant G. David Gordon, Jr., at the trial." Additionally, at oral argument,
plaintiffs' counsel graciously conceded that appellate issues sixteen and seventeen, involving
statutory securities fraud and violation of state securities fraud statutes, had no merit. We
therefore omit those issues from our review. See Lundstrom v. United Services Auto. Ass'n-CIC, 192 S.W.3d 78, 86 (Tex. App.--Houston [14th Dist.] 2006, pet. denied) (relying on
Bates v. Dallas Indep. Sch. Dist., 952 S.W.2d 543, 550 (Tex. App.--Dallas 1997, writ denied)
for the proposition that an appellate court may refuse to consider an issue conceded by a
party at oral argument). 
9. In our review of the record, we have found no documentary evidence that this transfer
was ever accomplished.
10. No written agreement was ever prepared to document this alleged agreement.